879 A.2d 166

**401 FOURTH STREET, INC., Appellee,**

**v.**

**INVESTORS INSURANCE GROUP, Appellant.**

Supreme Court of Pennsylvania.

Argued April 15, 2004.

Decided July 20, 2005.

---

446

448

Butler Buchanan, Esq., Audrey J. Copeland, Esq., Audrey Louise Jacobsen, Esq., Philadelphia, for Investors Insurance Group.

Derek Braslow, Esq., Alan Carl Milstein, Esq., Pennsauken, NJ, for 401 Fourth Street, Inc.

John Norig Ellison, Esq., Timothy Patrick Law, Esq., Philadelphia, for United Policyholders.

BEFORE: CAPPY, C.J., and CASTILLE, SAYLOR, EAKIN and BAER, JJ.

## OPINION

Chief Justice CAPPY.

In this appeal, we are asked to interpret a common, yet controversial, insurance policy provision which extends coverage to an insured for "damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building. . . ." For the reasons set forth herein, we conclude that the specific policy language at issue provides an insured with coverage for damages caused by the collapse or imminent collapse of a building or a part thereof and does not limit itself to damages for the actual collapse of a building. Based upon our holding today, we affirm the order of the Superior Court.

Appellee, 401 Fourth Street, Inc. ("Fourth Street"), owns a building located in Bridgeport, Pennsylvania, which is in Montgomery County. Fourth Street insured the building through an insurance policy issued by Appellant Investors Insurance Group ("Investors Insurance"). The policy was effective March 21, 1997 through March 21, 1998. Fourth Street incurred an additional premium for an endorsement covering collapse. Specifically, pursuant to Section D of the policy—"ADDITIONAL COVERAGE–COLLAPSE," [1] Investors Insurance provided coverage for loss or damage resulting from risks of loss involving the collapse of the building or part of the building:

> We will pay for loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building caused only by one or more of the following . . .
>
> \* \* \*
>
> 2. Hidden decay
>
> \* \* \*

1. The insurance policy at issue initially excludes payment for loss or damage caused by collapse. Policy, Causes of Loss—Special Form Para. B(2)(k), R.R. 2a. By "Additional Coverage for Collapse," however, the Policy extends specific coverage for risks of loss involving collapse as noted herein. Policy, Para. D. Additional Coverage—Collapse, R.R. 31a.

Collapse does not include settling, cracking, shrinkage, bulging or expansion.

On April 4, 1997, tenants in the building noticed that a parapet wall was bowed and leaning inward. Fourth Street filed an insurance claim for coverage on April 30, 1997. An engineer hired by Fourth Street inspected the building on May 1, 1997, and again a week later on May 8, 1997. Investors Insurance also hired an engineer to examine the building.

Fourth Street's engineer's report concluded that the internal bonds that tied the parapet wall to the structural framing of the building had recently given way, and that a large, sudden movement had occurred. The engineer described the situation as "very dangerous and must be repaired immediately." Franklin Engineering, Inc. Letter dated May 15, 1997, R.R. 93a. According to the engineer, the cost to repair the parapet wall would be between $90,000 and $100,000.

Conversely, Investors Insurance's engineer reported that the interior steel that had been covered by the building's brickwork had corroded, and as a result of that process, had expanded in volume. This, according to the engineer, caused the bricks above the corroded steel to be "jacked upwards." Investors Insurance's engineer concluded that the corrosion was attributable to "a lack of normal maintenance of the brick joints, roofing and shelf angle." C.N. Timbie Engineers, Inc. Letter dated May 19, 1997, R.R. 94a. Based upon the engineers' reports, Investors Insurance denied Fourth Street's claim under the policy.

As a result of the denial of its claim, on October 14, 1997, Fourth Street filed a breach of contract action against Investors Insurance in the Court of Common Pleas of Montgomery County. After discovery, the parties filed cross-motions for summary judgment.

The trial court denied Fourth Street's motion for summary judgment, granted Investors Insurance's motion, and dismissed Fourth Street's complaint. In reaching its conclusions, the court focused on the term "collapse" contained in the provision providing coverage for "risks of direct physical loss

involving collapse." Recognizing that since 1933, Pennsylvania case law has construed the term "collapse" to require the actual physical falling down of the structure, the trial court reasoned that here, Fourth Street's parapet wall did not collapse, as that term had been interpreted, and therefore, Investors Insurance properly denied Fourth Street's claim.

Fourth Street appealed to the Superior Court. A majority of the three-member panel of the court determined that coverage was proper under the policy and reversed the grant of summary judgment in favor of Investors Insurance. *401 Fourth Street, Inc. v. Investors Insurance Group*, 823 A.2d 177 (Pa.Super.2003). Contrary to the trial court's focus solely on the term "collapse," President Judge Joseph Del Sole, writing for the majority, emphasized the language *"risks* of direct physical loss *involving* collapse." (emphasis supplied). This language, according to the majority, distinguished prior case law and other policies regarding collapse from the policy at issue, and required a different result. The majority reasoned that "use of the terms 'risks' and 'involving' broadened the policy's coverage to include something less than a structure completely falling to the ground." *401 Fourth Street*, 823 A.2d at 179.

The majority also rejected the trial court's fear that a contrary interpretation would subject an insurer to liability for "potentially infinitesimal risks" or "the existence of some small or vague possibility" of collapse, as the situation before the court was not one of such low risk or possibility of collapse, as according to the majority, "both experts agreed that if repairs were not undertaken immediately, the parapet wall could completely collapse." *Id.* Accordingly, the Superior Court concluded that the trial court had erred as a matter of law in granting Investors Insurance's motion for summary judgment, and remanded for further proceedings.

Judge Joan Orie Melvin dissented. Specifically, the dissent looked to the policy language that defined "collapse" as not including "bulging," and concluded that the bowing of the parapet wall was not covered by the policy language. *Id.* Additionally, the dissent rejected the majority's focus on the

term "risks" and reasoned that such term did not broaden coverage. *Id.* at 180. Finally, contrary to the majority, the dissent warned that the majority's approach would "subject the insurers to liability based upon 'potentially infinitesimal risks' or 'the existence of some small or vague possibility' of collapse" predicting an opening of a "flood gate for claims seeking recovery for every bulging, bowed and leaning wall out there regardless of how imminent the danger it presents." *Id.*

 We granted allocatur to determine whether summary judgment was appropriate and, in doing so, to resolve the dispute regarding the proper interpretation of the insurance policy's endorsement regarding collapse. An appellate court may reverse the granting of summary judgment if there has been an error of law or an abuse of discretion. *Atcovitz v. Gulph Mills Tennis Club,* 571 Pa. 580, 812 A.2d 1218, 1221 (2002). As the interpretation of an insurance contract is a question of law, our standard of review is de novo; thus, we need not defer to the findings of the lower tribunals. Our scope of review, to the extent necessary to resolve the legal question before us, is plenary. *Buffalo Township v. Jones,* 571 Pa. 637, 813 A.2d 659, 664 n. 4 (2002); Pa.R.A.P. 2111(a)(2).

The arguments of the parties are fairly straightforward. Investors Insurance contends that under well-established Pennsylvania case law by this Court, the term "collapse," as contained in an insurance policy, has been interpreted to require the actual falling down of the wall. Here, the wall did not collapse, and in the absence of such a collapse, Fourth Street is not entitled to coverage. Furthermore, according to Investors Insurance, the terms "risks" and "involving" neither removed this case from our prior controlling case law nor did they expand coverage, and by engaging in a tortured construction of the policy language, the Superior Court improperly broadened coverage by not requiring an actual collapse. Additionally, Investors Insurance maintains that the Superior Court ignored that the policy specifically excluded from coverage "bulging" and that on this basis, Fourth Street is not

entitled to relief. Finally, Investors Insurance echoes Judge Orie Melvin's concern that insurers would now be subject to numerous claims seeking recovery for every defect based on an infinitesimal risk of collapse, regardless of the imminence of the danger, thus, turning the insurance policy into a maintenance policy.

Fourth Street counters that the Superior Court majority properly interpreted the policy language which covered Fourth Street's "risk of direct physical loss involving collapse," when the wall of the building was in danger of collapse. As the term "collapse" was not defined by Investors Insurance, it was for the court to construe. According to Fourth Street, the term "collapse," as well as the phrase "risks of direct physical loss involving collapse," is ambiguous, and a growing majority of courts have defined the term "collapse" as "any serious impairment of structural integrity." Thus, the policy language reasonably includes not just when a wall actually falls, but also when a wall is in imminent danger of falling. Furthermore, unlike the policies at issue in prior case law, the language which includes the terms *risk* of direct physical loss *involving* collapse provides broader coverage to Fourth Street. Finally, Fourth Street offers that it would be against public policy only to find insurance coverage when an insured's building actually falls to the ground, as it would endanger the lives of persons in and around the building as well as surrounding properties.

■■■ To address the parties' arguments we begin our analysis by setting forth the well-established rules of insurance contract interpretation. "The task of interpreting [an insurance] contract is generally performed by a court rather than by a jury." *Madison Construction Co. v. Harleysville Mutual Ins. Co.,* 557 Pa. 595, 735 A.2d 100, 106 (1999) (citations omitted); *Standard Venetian Blind Co. v. American Empire Ins. Co.,* 503 Pa. 300, 469 A.2d 563, 566 (1983). The purpose of that task is to ascertain the intent of the parties as manifested by the terms used in the written insurance policy. *Gene & Harvey Builders, Inc. v. Pennsylvania Manufacturers' Association Ins. Co.,* 512 Pa. 420, 517 A.2d 910, 913

(1986)(*quoting Standard Venetian Blind Co.* (citations omitted)). When the language of the policy is clear and unambiguous, a court is required to give effect to that language. *Id.* When a provision in a policy is ambiguous, however, the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage. *See id.* "Contractual language is ambiguous 'if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" *Madison Construction Co.*, 735 A.2d at 106 (*quoting Hutchison v. Sunbeam Coal Co.*, 513 Pa. 192, 519 A.2d 385, 390 (1986)). Finally, "[i]n determining what the parties intended by their contract, the law must look to what they clearly expressed. Courts in interpreting a contract, do not assume that its language was chosen carelessly." *Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659, 662 (1982)(*quoting Moore v. Stevens Coal Co.*, 315 Pa. 564, 173 A. 661, 662 (1934)). Thus, we will not consider merely individual terms utilized in the insurance contract, but the entire insurance provision to ascertain the intent of the parties.

With these principles in mind, we turn to resolution of the arguments raised by the parties. Based on the above-stated principles of contractual interpretation, it becomes clear that the focal point of our inquiry is the language of the insurance policy. The parties first focus on the term "collapse." Specifically, Investors Insurance contends that the single policy term "collapse" requires the actual falling down of the wall for coverage. *Skelly v. Fid. & Cas. Co. of New York*, 313 Pa. 202, 169 A. 78, 79 (1933). Here, the wall did not fall down, and thus, Fourth Street is not entitled to coverage. With respect to this argument, Fourth Street counters that the term "collapse" is ambiguous and, according to Fourth Street, connotes only a substantial impairment of the building's structural integrity.

While each of these arguments carry with them some force, we need not consider, or reconsider, the precise mean-

ing of the term "collapse" in this appeal.[2] As noted above, we do not analyze insurance contract terms in isolation to ascertain the intent of the parties, but rather, must take into account the entire contractual provision at issue. Accordingly, even accepting, as suggested by Investors Insurance and our prior case law, that the term "collapse" requires a falling down of a structure, we find that the proper focus in this appeal is directed to the meaning and import of the entire phrase "risks of direct physical loss involving collapse." Thus, we turn to consideration of this clause *in toto*.

Interpretation and construction of the entire phrase "risks of physical loss involving collapse" is an issue of first impression for our Court. Investors Insurance argues that the terms "risks" and "involving" neither remove this case from our prior controlling case law nor did they expand coverage. Fourth Street offers that the policy language includes when a wall is in imminent danger of falling and that, unlike the policies at issue in prior case law, the language which includes the phrase *risk* of direct physical loss *involving* collapse provides broader coverage.

Recent decisions from other jurisdictions specifically interpreting similar policy language, although not binding on our Court, are instructive. These courts have found the provision to be ambiguous and interpreted the phrase "risk of physical loss involving collapse" to provide broader coverage than a

2. Investors Insurance's position regarding the interpretation of this single term is supported by our case law. Historically, our Court has considered the policy term "collapse" to require the sudden falling together of a structure. *Kattelman v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 415 Pa. 61, 202 A.2d 66, 67 (1964); *Skelly v. Fid. & Cas. Co. of New York*, 313 Pa. 202, 169 A. 78, 79 (1933); *see also Dominick v. Statesman Ins. Co.*, 692 A.2d 188, 190–91 (Pa.Super.Ct.1997). While as noted below, we need not reconsider the proper interpretation of the term "collapse" in this appeal, we simply note that over the last fifty years, the term "collapse" as used in property loss insurance has generated much litigation, and the interpretation of this term has created a split among the various courts that have addressed this issue. *See generally* Annot., *What constitutes "collapse" of a building within coverage of property insurance policy*, 71 A.L.R.3d 1072 (1976); *see also* Alan R. Miller, et al., *What Constitutes a Collapse Under Property Insurance Policy*, 29–WTR Brief 20, 21 (Winter, 2000).

mere loss due to collapse, and as covering the threat of loss when faced with imminent collapse.

Specifically, in *Doheny West Homeowners' Ass'n v. American Guar. & Liab. Ins. Co.*, 60 Cal.App.4th 400, 405, 70 Cal.Rptr.2d 260 (1997), the California intermediate appellate court was faced with a clause identical to the clause at issue *sub judice.* The court offered that it was undisputed that the clause covered "collapse of a building," i.e., if a building falls down or caves in, but recognized that the clause did not limit itself to the "collapse of a building," but covered " 'risk of loss,' that is, the threat of loss." *Doheny,* 60 Cal.App.4th at 405, 70 Cal.Rptr.2d 260. Furthermore, the court opined that by its terms, the clause covered not only loss resulting from actual collapse, but also "loss 'involving' collapse. Thus, with the policy containing the undefined phrases 'risk of loss' and 'involving collapse,' the court found the clause to be ambiguous and concluded that the policy provision broadened coverage beyond actual collapse," and required that the damage must be such that it would lead to collapse. *Id.*

Fearful, however, that neglect over an extended period could result in collapse, and that such an interpretation of the provision could convert the insurance policy into a maintenance agreement, the court concluded that collapse could be actual or imminent. *Id.* at 406, 70 Cal.Rptr.2d 260. According to the court, "imminent" meant "likely to happen without delay; impending, threatening." *Id.* (citing Webster's New World Dictionary (3d College Ed.1991)). This requirement not only was consistent with the policy language and the expectations of the insured, but also it avoided the absurdity of requiring an insured to wait for a seriously damaged building to fall to the ground. *Id.* In sum, the court held that the provision, "risks of direct physical loss involving collapse of a building," covered imminent collapse and did not limit itself to the actual collapse of the building. *See also Jordan v. Allstate Ins. Co.,* 116 Cal.App.4th 1206, 1222, 11 Cal.Rptr.3d 169 (Cal.Ct.App.2004)(stating that coverage for "loss or damage caused by or resulting from *risks* of direct physical loss involving collapse ... clearly did not limit coverage to *actual*

collapse but necessarily embraced *imminent* collapse.")(emphasis in original); *Stamm Theatres, Inc. v. Hartford Casualty Ins. Co.*, 93 Cal.App.4th 531, 113 Cal.Rptr.2d 300 (Cal.Ct. App.2001)(same).

Similarly, in *Ocean Winds Council v. Auto-Owner Ins. Co.*, 350 S.C. 268, 565 S.E.2d 306 (S.C.2002), the Supreme Court of South Carolina first noted that the phrase "risks of direct physical loss involving collapse" was more ambiguous than use of the term "collapse" alone, citing *Doheny*. The *Ocean Winds Council* Court rejected the phrase as requiring actual collapse as too narrow an interpretation. "This phrase is more expansive than the word 'collapse' and appears to cover even the threat of loss from collapse." *Ocean Winds Council*, 565 S.E.2d at 308. The court went on to reject a "substantial impairment" standard fearing that collapse coverage would be "converted into a maintenance agreement by allowing recovery for damage which, while substantial, does not threaten collapse." *Id.* Ultimately, the *Ocean Winds Council* Court concluded that an imminent collapse requirement was the most reasonable interpretation of the policy clause covering "risks of direct physical loss involving collapse." *Id.; Customized Distribution Services v. Zurich Ins. Co.*, 373 N.J.Super. 480, 862 A.2d 560, 565 (2004)(finding the court's reasoning in *Ocean Winds Council* regarding policy supporting view that there need not be any actual physical damage to property for the triggering of coverage).

Perhaps most persuasively, in *Assurance Co. of America v. Wall & Assoc. LLC of Olympia*, 379 F.3d 557, 558 (9th Cir.2004), the United States Court of Appeals for the Ninth Circuit, considering policy language identical to that before us, concluded that the policy provision provided coverage not only for actual collapse, but also for imminent collapse, even utilizing the traditional view of the term "collapse."

> To interpret the clause as a whole to mean that coverage extends only upon 'a sudden falling down' impermissibly disregards the other aspects of the clause and renders them ineffective. . . . **Thus, even if the district court properly defined the *word* "collapse" to mean "a sudden falling**

**down," it erred in ending the inquiry there; the court should have then considered the rest of the clause's language to ascertain its practical and reasonable interpretation. We therefore conclude that this policy language not only covers actual collapse but also imminent collapse.**

*Assurance Co. of America,* 379 F.3d at 563 (emphasis supplied) (citations omitted).

██ Upon consideration of the arguments of the parties and the fast-emerging consensus of jurisdictions regarding the nature and the scope of the policy language "risks of direct physical loss involving collapse of a building or any part of a building," we determine that the undefined contractual language is not clear and free from ambiguity but is reasonably susceptible of different constructions and being understood in more than one sense, and thus is ambiguous.

██ By its terms, the provision contemplates broader coverage than policy language simply employing the term "collapse." This conclusion is made manifest when the language chosen by Investors Insurance in its policy, "We will pay for loss or damage caused by or resulting from risks of direct physical loss involving collapse," is compared with other insurance policy language that does not suggest such broad coverage. *See Weiner v. Selective Way Ins. Co.,* 793 A.2d 434, 436 (Del.Super.Ct.2002)("[Insurer] will pay for direct loss or damage to Covered Property, caused by collapse of a building or any part of a building. . . ."); *American Concept Ins. Co. v. Jones,* 935 F.Supp. 1220, 1225 (D.Utah 1996)("We insure for direct physical loss to covered property involving collapse."); *Campbell v. Norfolk Dedham Mutual Fire Ins. Co.,* 682 A.2d 933, 935 (R.I.1996)(same).

██ Having found an ambiguity, we are bound by the controlling principle that when a provision in a policy is ambiguous, the policy is to be construed in favor of the insured and against the insurer as drafter of the policy. *Mohn v. American Casualty Co. of Reading,* 458 Pa. 576, 326 A.2d 346, 352 (1974). We conclude that the policy language

provides coverage that extends beyond the situation in which an insured's building falls to the ground, even in light of the traditional interpretation of the term "collapse." It covers not only loss for a collapse, but also the *risk* of loss *involving* a collapse. To interpret this broad policy language to be limited to only the falling of the building, even under existing case law, would be to give too narrow an interpretation to the broad language drafted by the insurer. Conversely, to interpret the broad policy language to cover substantial impairment of structural integrity, we believe to be too distant from the concept contained in our existing case law which requires the falling of the building, and as noted above, would possibly convert the policy into a maintenance agreement by permitting recovery for damage which, while substantial, does not threaten collapse of the structure. *Ocean Winds Council,* 565 S.E.2d at 308.

 Thus, we hold that under the ambiguous language at issue in this policy, construed in favor of the insured, the policy provides coverage for damage caused by the falling down, or imminent falling down of a building or part thereof.[3]

 We now must consider whether the Superior Court properly rejected the trial court's entry of summary judgment in favor of Investors Insurance. Specifically, we shall determine whether there is any genuine issue of material fact and if Fourth Street, who will bear the burden of proof at

3. Albeit not argued in any meaningful fashion by Investors Insurance, we also find that the exclusion from the definition of the term "collapse" for "bulging" does not compel summary judgment in favor of Investors Insurance. Although an insurance contract may state that a collapse did not include settling, cracking, shrinking, bulging, or expansion, it is difficult to imagine a collapse that would not include some of these attributes. Thus, the term "collapse" can reasonably be interpreted as not including minor settling, cracking, or bulging, but includes settling, cracking, or bulging that result in the collapse or, pursuant to the language of the policy provision at issue here, immediate collapse, of the structure. Indeed, coverage under the policy language at issue *sub judice* would be illusory and contrary to the intent of the parties if bulging was part of an imminent collapse and yet this condition was excluded from coverage. *Accord American Concept Ins. Co.,* 935 F.Supp. at 1227–28.

trial, has failed to produce evidence of facts essential to its cause of action so that it would require the issues to be submitted to a jury.[4]

The trial court found no dispute as to the facts underlying this matter. It erred, for the reasons stated above, in its interpretation of the pertinent policy language. The Superior Court majority, while coming to what we believe to be a correct interpretation of the policy language, appeared to have also found no genuine issue of material fact. Specifically, the majority opined that both experts agreed that collapse of the wall was imminent. Conversely, the dissent suggested that neither expert found the collapse to be imminent.[5]

4. Summary judgment is appropriately granted only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law. Pa.R.Civ.P. 1035.2(1). Likewise, summary judgment is proper in cases in which "an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to a cause of action or defense in which a jury trial would require the issues to be submitted to a jury." Pa.R.Civ.P. 1035.2(2). In considering the merits of a motion for summary judgment, a court views the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Jones v. SEPTA*, 565 Pa. 211, 772 A.2d 435, 438 (2001). In considering whether there exists a genuine issue of material fact, the court does not weigh the evidence, but determines whether a reasonable jury, faced with the evidence presented, could return a verdict for the non-moving party. It is only after a non-moving party survives the motion for summary judgment that the finder of fact on remand weighs the evidence and determines whether the party has proven each element of its claim. *Accord, Redland Soccer Club v. Department of the Army*, 548 Pa. 178, 696 A.2d 137, 147 (1997). Finally, the court may grant summary judgment only when the right to such judgment is clear and free from doubt. *Marks v. Tasman*, 527 Pa. 132, 589 A.2d 205, 206 (1991).

5. We recognize that after the Superior Court determined that the trial court erred in its interpretation of the insurance policy, it was not necessarily proper for the Superior Court to continue and to speak to whether or not there was a genuine issue as to material fact regarding imminent collapse, and instead, should have remanded the matter for consideration by the trial court in light of its determination. Since the Superior Court made conclusions regarding whether there was a genuine issue as to material facts under the proper interpretation of the policy language, we believe that the interests of judicial economy will be best served if we determine whether the Superior Court erred in its

Our review of the record reveals that Fourth Street's expert offered that the situation was "extreme" and "very dangerous and [the wall] must be repaired immediately." Franklin Engineering, Inc. Letter dated May 15, 1997, R.R. 93a. Investors Insurance's expert, while not directly refuting Fourth Street's expert's opinion, determined that the corrosion and resulting parapet damage had been ongoing and that the "damage will continue until the parapet falls backward onto the roof. If this happens, some brick will probably fall outward which could damage the loading dock roof below." C.N. Timbie Engineers, Inc. Letter May 19, 1997, R.R. 94a.

Based upon the foregoing, we find that the majority of the Superior Court was somewhat mistaken in concluding that "experts agreed that if repairs were not undertaken immediately, the parapet wall could completely collapse." The dissent, however, also erred in its conclusion that "neither expert testified that collapse is imminent." First, it is seemingly true that neither expert "testified," as it appears that the trial court considered the cross-motions for summary judgment based upon the parties' pleadings and exhibits in support thereof. Yet, while Fourth Street's expert's letter does not use the magic language "collapse is imminent," it all but states so when it expresses the engineer's opinion that the situation was "extreme" and "very dangerous and [the wall] must be repaired immediately." We must construe the record in the light most favorable to the non-moving party, here, Fourth Street. In this light, we believe that there exists a genuine issue of material fact regarding the imminent collapse of the wall and that Fourth Street has produced sufficient evidence of facts that are essential to its cause of action so that it would require the issue to be submitted to a finder of fact. The order of the Superior Court, reversing the granting of summary judgment in favor of Investors Insurance and remanding for further proceedings, is hereby affirmed.

determination. *Danville Area School Dist. v. Danville Educ. Ass'n, PSEA/NEA,* 562 Pa. 238, 754 A.2d 1255, 1262 (2000).

Justice NIGRO and Justice NEWMAN did not participate in the consideration or decision of this case.

Justice SAYLOR files a dissenting opinion.

Justice SAYLOR, dissenting.

To the extent that the majority's decision reflects a broadening of the understanding of the term "collapse" as utilized in property insurance policies to subsume "imminent collapse," *see* Majority Opinion, *op.* at 174 n. 3, I concur with this departure from the existing precedent, which had embraced the narrower view requiring that property or a part of it actually fall down. *See Kattelman v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 415 Pa. 61, 64, 202 A.2d 66, 67 (1964) (citing *Skelly v. Fid. & Cas. Co. of New York*, 313 Pa. 202, 169 A. 78 (1933)); *Dominick v. Statesman Ins. Co.*, 692 A.2d 188, 190–91 (Pa.Super.1997). In my view, however, a change of this character should be applied prospectively, and not retroactively to existing policies such as the one at issue here, since the insurers were entitled to rely on this Court's existing case law in crafting the applicable terms of such policies issued in Pennsylvania.

I also differ with the majority's approach, and that of the Superior Court, in construing the phrase "risks of direct physical loss involving collapse" as extending coverage to protect against future collapse. While I agree that the term "risks of direct physical loss" is intended to reflect a broad form of coverage, its basic function is to extend coverage to a range of fortuitous events (such as fire, lightning, explosion, windstorm, hail, and smoke), *see generally* LEE R. RUSS, 10 COUCH ON INSURANCE § 148.50 (2003), but not to protect against losses occasioned in mere anticipation of future events of these sorts. Indeed, in the policy at issue, "risks of direct physical loss" is not an isolated phrase confined to the collapse provision, but rather, stands as the central conception delineating the basic coverage provided, as it is specifically designated as being coterminous with "Covered Causes of Loss."[1]

1. The core coverage provision indicates that the insurer "will pay for direct physical loss of or damage to Covered Property" at the premises

The way collapse is handled in the policy at issue is that it is subject, in the first instance, to a specific exclusion from the broad conferral of coverage, and thus, removed from the range of covered causes of loss (or the applicable risks of direct physical loss). *See* Policy, Cause of Loss—Special Form ¶ B(2)(k), R.R. 2a. The policy then affords specific coverage for collapse as "additional coverage," but subject to several express limitations. *See* Policy, Cause of Loss—Special Form ¶ D. In connection with this treatment, the language relied upon by the majority to extend coverage relative to future events in fact merely functions to restore collapse to the category of covered causes of losses, thereby reflecting the policy's treatment of such risk as a defined one in an otherwise all-risk policy. *Accord Ramsden v. Auto–Owners Ins. Co.*, 2000 WL 33521860, *4 (Mich.App. March 21, 2000) (*per curiam* ) (expressing the view that "the phrase 'risk of collapse' in this indemnity policy does not refer to the potential for collapse in the future but rather is used more generically to include the circumstance of 'collapse' within the 'risks' or perils insured against.").[2] *But see Assurance Co. of America*

described in the Declarations caused by or resulting from any *Covered Cause of Loss*. Policy, Building and Personal Property Coverage Form ¶ A, R.R. at 46a (emphasis added). Under the policy, "Covered Cause of Loss" means "RISKS OF DIRECT PHYSICAL LOSS," *id.* at § A(3), R.R. at 1a (emphasis in original) (cross-referencing Policy, Causes of Loss—Special Form ¶ A, R.R. at 1a), unless the loss is subject to an express exclusion or limitation. *See id.*

In fact, "risks of direct physical loss" is frequently employed by insurers in this way as a broad catch-phrase describing "all-risk" policy coverage (or insurance against all risks not within the defined exclusions and limitations, as opposed to defined-risk coverage). *See* Russ, 10 Couch on Insurance § 148.50.

2. This point is advanced by one commentator as follows:

Of course, the cases finding coverage for a "risk of collapse" are inherently suspect, and turn on a questionable semantic conclusion. These cases suggest that the term 'risk' is equivalent to 'possibility' or 'threat,' and conclude a building suffering from structural impairment (but that has not collapsed) suffers from a 'risk' of collapse. In the context of a property policy, however, the term 'risk' means 'peril' or 'hazard,' not the 'threat' or 'possibility.' Indeed, property policies typically cover 'all risks,' or specified 'risks' such as fire, lightning, theft or vandalism. The courts would never suggest that such policies cover every expense associated with a 'threat' or 'possibility' of

*v. Wall & Assoc. LLC of Olympia,* 379 F.3d 557, 558 (9th Cir.2004); *Ocean Winds Council of Co–Owners, Inc. v. Auto–Owner Ins. Co.,* 350 S.C. 268, 565 S.E.2d 306, 308 (S.C.2002). Indeed, the alternate approach to which the majority gives credence in finding an ambiguity in the policy terms is fundamentally inconsistent with the policy's central equation between "covered causes of loss" (again, events such as fire, lightning, explosion, windstorm, hail, smoke, and, here, collapse) and "risks of direct physical loss." *See supra* note 1.[3]

Given the central role of the concept of "risks of direct physical loss" to policies affording insurance protection against property damage or loss, I believe that the majority's construction of the provision as effectively extending coverage to losses and/or expenditures incurred in contemplation of future events may have wider ranging consequences than it may anticipate.

For these reasons, I respectfully dissent.

fire, lightning, theft or vandalism, let alone the 'threat' or 'possibility' of 'all risks.'
26 No. 15 Ins Litig Rep. 539 (Sep. 10, 2004).

**3.** Under the understanding that the phrase "risk of direct physical loss" is used in the collapse provision as it is everywhere else in the policy, namely, to delineate the range of covered risks, and not to extend coverage for anticipation-related losses and/or expenditures, it is apparent that the additional words "involving collapse" function to describe the particular risk that is the subject matter of the specific-coverage provision.