OPINION OF THE COURT
Marylin G. Diamond, J.
Motion sequence numbers 004 and 005 are consolidated herein for decision. This case involves a claim by plaintiff Hudson 500 LLC for insurance coverage under a policy issued by defendant Tower Insurance Company of New York relating to what Hudson alleges was a partial collapse of its building, located at 500 Hudson Street in Manhattan (the building), on or about August 23, 2005.
In motion sequence number 004, Tower moves for summary judgment in its favor on the grounds that: (1) Hudson’s alleged loss occurred prior to the period covered by the insurance policy in question, and (2) the building did not suffer a compensable “collapse” as that term is employed in the policy. In motion sequence number 005, Hudson moves for partial summary judgment on the issue of liability under the policy.
The Policy
The limits for damage to property under the policy are $700,000; the limits for loss of business income are $200,000.
The relevant policy provisions state as follows:
“B. EXCLUSIONS
“2. We will not pay for loss or damage caused by or resulting from any of the following . . .
“d. (1) Wear and tear
“(2) Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself; . . .
“(4) Settling, cracking, shrinking or expansion. . . .
“3. We will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c. But if an excluded cause of loss that is listed in 3.a. through 3.c. result in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss. . . .
*880 “c. Faulty, inadequate or defective: . . .
“(4) Maintenance; of part or all of any property on or off the described premises.
“D. ADDITIONAL COVERAGE - COLLAPSE “1. We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building insured under this Coverage Form, if the collapse is caused by one or more of the following: . . .
“b. Hidden decay; . . .
“f. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction. However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in D.l.a. through D.l.e., we will pay for the loss or damage even if use of defective material or methods, in construction, remodeling or renovation, contributes to the collapse. . . .
“4. Collapse does not include settling, cracking, shrinkage, bulging or expansion.”
The Alleged Loss
On or about August 3, 2005, Hudson purchased the building that is the subject of this litigation. Hudson alleges that, on or about August 23, 2005, a contractor which it had retained was working in the building stripping sheetrock and other finishes from the building’s brick wall and knocking down partition walls in order to renovate first- and second-floor spaces. At his deposition, Ibrahim Safakamal, the owner of the construction company hired by Hudson, testified that late in the afternoon of August 23, 2005, his son-in-law, who was a subcontractor on the job, informed him that he had discovered a joist hanging below the ceiling of the first-floor space. Safakamal went back to the building the next day and he and his workers continued to remove debris from the building for five or six hours. He claimed that when he was removing a partition wall he saw “something like a poof’ and some movement in the floor joist. He also heard a noise and saw dirt come out. According to Safakamal, the mortar looked like dirt. Safakamal further stated that he saw “more fresh wood” and concluded that one of the joists had continued to break. When Safakamal saw the movement in the joist, he stopped the work and called the fire department. The building was evacuated by the fire department and the building *881 department and was shored up by a contractor hired by the department.
The Issues Raised on the Parties’ Respective Motions
A. Whether the Structural Damage Predated Coverage
1. Tower’s Evidence — On its summary judgment motion, Tower contends that the loss is not covered because it results from wear and tear, faulty maintenance and problems which occurred prior to the policy period. In doing so, it relies (1) on a report prepared by Kenneth O. Wille and Associates, Inc., (2) an affidavit from an architect, George Rycar, and (3) an affidavit from an engineering consultant, Henry R. Naughton.
As to the Wille report, Tower points out that the report had advised Hudson prior to its purchase of the building of the presence of wall cracks that was evidence of significant structural deterioration or failure. The Wille report also found that the stairway adjacent to the Christopher Street wall was sloping and that there were significant cracks in that area. Moreover, the engineer who wrote the report was concerned that settlement and movement in the building were continuing and pervasive and needed to be monitored. The report also notes the presence of deflection and settlement on the stairs “which appears to have existed for a long period of time.” Thus, Tower argues that even prior to its purchase of the building, Hudson was put on notice that the building was poorly maintained and that considerable cracking and settling was present.
As to George Rycar, he is an architect hired in 2000 by the prior owner of the building to develop a plan to stabilize the building. In his affidavit, he states that at the time that he inspected the building,
“the over 100 year old premises . . . evidenced signs of wear and tear and a lack of maintenance. Specifically, I noticed cracking and displacement of the exterior brick walls that required repair. . . . The planned work consisted of necessary structural repairs to both the exterior walls on the Christopher Street and the Hudson Street sides of the building.”
According to Rycar, the building required significant structural repair work which was not done by the prior owner, because of financial considerations.
As to Henry R. Naughton, he is an engineering consultant who inspected the building on November 30, 2005 and reviewed the reports and photographs prepared by the various other architects and engineers. According to Naughton, the slight *882 bulging in the Christopher Street wall between the first and second floors that he observed on November 30, 2005 was indicated both in photographs taken by Wille on July 20, 2005 and in the architectural drawings of Hudson’s architect, Darius Toraby. Naughton states that, in the photographs, he noticed that the joists between the first and second floors had been “sistered,” a technique to reinforce joists by securing additional wood to them. According to Naughton, the fact that the joists had been sistered by the prior owner indicates that the cracking and bulging in the Christopher Street wall had predated the purchase of the building by Hudson. Finally, in his reply affidavit, Naughton contends that it was not the removal of the partitions that caused the Christopher Street wall to bulge, but rather that the previously existing bulge had caused the joists to fall from their pockets.
2. Hudson’s Evidence — On its motion, Hudson argues, on the basis of the affidavits of David Reyhan and Darius Toraby, as well as the Wille report, that the damage occurred on or after August 23, 2005, when the partitions were removed and the joists were no longer supported. According to Hudson, the damage was the result of hidden decay, i.e., broken joists which were both supported and covered by partition walls until the renovation work began, and falls within the policy coverage for collapse caused by hidden decay.
As to David Reyhan, he is a licensed professional engineer who performed site visits to the building on or about June 28, 2005 and July 8, 2005, in connection with Hudson’s plans to purchase the building. According to Reyhan, at the time of his site visits, the north load-bearing brick wall and other walls were hidden from view by shelves, sheetrock and other finishes. Reyhan states that, at the time of his visits, the building appeared to be in good condition but required maintenance, as would be expected for a building of its age. According to Reyhan:
“there were cracks in the Building’s facade’s decorative parging due to shrinkage and expansion that I recommended be addressed for cosmetic reasons. Parging is a thin[ ] coat of plaster or mortar for giving a relatively smooth surface to rough masonry or for sealing it against moisture and for cosmetic reasons. In addition, one stairwell had some inactive non-structural cracks that I again recommended be addressed for cosmetic reasons.
*883 “The cracks indicated that the Building had experienced some movement over time, as would any building of such age.”
According to Reyhan, on August 23, 2005, “the building had suffered a substantial impairment of its structural integrity and was in danger of complete collapse.” Reyhan also states: “It is further my opinion within a reasonable degree of professional certainty that, until they were removed, the partition walls and framing, which were not designed to be load bearing, would have provided support to the structure after wooden beams supporting the floor fell out of their beam pockets.”
With respect to the “sistered” joists, Reyhan states that, rather than indicating that the bulging condition predated the events of August 2005, the “sistering” shows that the building was being maintained and that the joists fell due to hidden decay.
Hudson also submits an affidavit from Darius Toraby, a registered architect and principal of the firm Darius Toraby Architects, who states that when he visited the building on August 3, 2005 and took photographs of the building, he did not see any structural cracks in the building’s Christopher Street facade. He states that when he again visited the building, on or about August 23, 2005, he saw structural cracks that he did not see on his prior visit, concluding that the structural failure to the wall occurred on or about August 23.
Hudson also relies on the Wille report. It argues that Tower, in also relying on the report, failed to emphasize other portions of the report which provide a more positive assessment of the building. Thus, in discussing the exterior walls, the report states: “Considering the age of the building, the exterior walls are in acceptable condition. The brick masonry does exhibit some weathering, minor cracks and limited areas of dislodged mortar. . . . Although, not an immediate need, there will be a need for some masonry repairs during the next several years.” Moreover, in its summary, the report states: “Overall, the building was found to be in generally satisfactory condition. Other than the wall cracks, the building exhibits no evidence of significant structural deterioration or failure.”
Moreover, rather than finding poor maintenance and a dilapidated condition, as Tower contends, the report states that:
“[t]he building exhibits various deficiencies, which are described in the body of this Report. During the past 10 years, the building has received new win *884 dows, replacement heating boiler (and domestic water heater), and some kitchen and bathroom upgrades. The major building components and public areas appear to be adequately maintained. We did not observe evidence of any significant deferred maintenance.”
3. Court’s Conclusion — Thus, the court is faced with conflicting opinions of experts as to whether the building was well or poorly maintained before it was purchased by Hudson, whether the cracks in the Christopher Street wall which existed before August 2005 were structural or cosmetic, whether the bulging in that wall occurred before, or on or after August 23, 2005, and whether structural damage predated the period of coverage or not. These are the very sort of factual disputes that must be decided by the trier of fact and not by the court on motions for summary judgment. (Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395, 404 [1957].)
B. Whether Settling, Cracking and Bulging Constitute Collapse under the Policy
Tower argues that irrespective of whether the damage to the building occurred during the policy period, it did not constitute a “collapse” within the meaning of the policy and is therefore not covered. According to Tower, since no part of the building ever fell down, there was no collapse. Citing Dalton v Harleysville Worcester Ins. Co. (2007 WL 2120403, 2007 US Dist LEXIS 52960 [ED NY 2007]), Tower contends that under New York insurance law, a collapse means “total or near total destruction,” and that such destruction did not occur to the building at issue here.
Hudson argues, however, that under New York law, the definition of collapse is more flexible, encompassing “a substantial impairment of the structural integrity of a building” (Royal Indem. Co. v Grunberg, 155 AD2d 187, 189 [3d Dept 1990]).
In Dalton, which is relied on by Tower, the federal court interpreted a decision of the Court of Appeals, Graffeo v United States Fid. & Guar. Co. (14 NY2d 685 [1964]), as establishing a narrow definition of “collapse” under New York law. In Graffeo, the concrete slab on which a split-level house rested had settled, resulting in the interior walls of the house pulling away from the ceiling and creating crevices, as well as a four-inch separation between the slab and the moldings. Nowhere in the Appellate Division decision, however, does the Court indicate whether the damage was primarily cosmetic or whether it consti *885 tuted a substantial impairment of the structural integrity of the house. The Second Department decision, which was left standing by the Court of Appeals, merely concluded that a minority view “which construes ‘collapse’ as a ‘sinking, bulging, cracking, pulling away of the wall’ ” (Graffeo v United States Fid. & Guar. Co., 20 AD2d 643, 644 [2d Dept 1964] [citation omitted]), if applied to the Graffeo facts, would do violence to other policy provisions, such as the exclusion of coverage for settling.
In so concluding, the Court noted that the Third Department had “interpreted the ‘collapse’ of a building as used in an insurance policy to include ‘an element of suddenness, a falling in, and total or near total destruction.’ ” (Id.) The Third Department has since interpreted the term “collapse” more broadly, concluding that a determination as to whether a collapse has occurred rests largely on the degree of damage. “In the view of a numerical majority of American jurisdictions, a substantial impairment of the structural integrity of a building is said to be a collapse.” (Royal Indent. Co. v Grunberg, 155 AD2d at 189; see also Nemier v Liberty Mut. Fire Ins. Co., 289 AD2d 1053 [4th Dept 2001].)
This court agrees with the Third Department’s more recent approach to the issue under which a collapse, as that term is employed in an insurance policy, does not require the total or near total destruction of the building but, rather, only a substantial impairment of the structural integrity of a building. (See Royal Indent. Co. v Grunberg, 155 AD2d at 189.)
Tower nevertheless also asserts that the cracking and bulging which occurred herein do not constitute a collapse under the policy and are not therefore covered. It does not appear that the courts of New York have addressed the question of whether cracking and bulging which are incident to the substantial impairment of the structural integrity of the building preclude coverage under a policy such as that in issue herein. This court is, however, persuaded by the conclusions reached in other jurisdictions that where a collapse has occurred, the fact that cracking and bulging also occur should not prevent coverage for collapse since it would be hard to imagine a collapse that did not include some cracking or bulging of walls. (See American Concept Ins. Co. v Jones, 935 F Supp 1220, 1227 [D Utah 1996]; 401 Fourth St., Inc. v Investors Ins. Group, 583 Pa 445, 460, 879 A2d 166, 174 [2005].) Nevertheless, there are numerous factual questions, such as whether the structural integrity of the building was in fact substantially impaired and, if so, whether that *886 impairment occurred during the term of the insurance policy as a result of hidden decay, as Hudson contends, or was a preexisting problem resulting from years of poor maintenance and known by Hudson, as Tower contends, which precludes summary judgment.
Accordingly, in motion sequence number 004, Tower’s motion for summary judgment is denied. In motion sequence number 005, Hudson’s motion for partial summary judgment is denied.