J-A22023-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| DOOLITTLE INVESTMENTS, LLC | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| MOTORISTS MUTUAL INSURANCE COMPANY | |
| | No. 235 MDA 2016 |

Appeal from the Order Entered December 31, 2015
In the Court of Common Pleas of Lancaster County
Civil Division at No(s): CI-08-01714

BEFORE:  GANTMAN, P.J., PANELLA, J., and JENKINS, J.

MEMORANDUM BY PANELLA, J.                **FILED NOVEMBER 16, 2016**

Appellant, Doolittle Investments, LLC ("DI"), appeals from the order granting summary judgment to its insurer, Motorists Mutual Insurance Company ("Motorists") on DI's claims for declaratory judgment and insurance bad faith. DI argues that the trial court erred in concluding, as a matter of law, that its loss was not covered under the insurance contract as no "collapse" had occurred. We conclude that DI provided sufficient evidence to create a triable issue of fact, and therefore reverse.

This case centers on the application of the term "collapse," as utilized in an insurance policy issued by Motorists, to essentially undisputed facts. The insurance policy provided coverage for damage "caused by collapse of a building or any part of a building … if the collapse is caused by … (2) Hidden

decay [or] … (6) Use of defective material or methods in construction, remodeling, or renovation if the collapse occurs during the course of the renovation." The policy explicitly excludes coverage for any loss caused by "[s]eizure or destruction of property by order of governmental authority."

DI owned a historic property ("the property") in Columbia Borough, Lancaster County, and desired to remodel the interior to allow for multiple commercial uses. Pursuant to this goal, DI hired Beaver Creek Construction, LLC ("Beaver Creek") to investigate the basement of the property to determine whether it could be remodeled to suit commercial use.

As part of its investigation, Beaver Creek excavated inside the foundation walls to determine the structure of the foundation. Several weeks later, David Doolittle, principal owner of DI, contacted Jeffrey Helm, a municipal officer for Columbia. Helm held several positions for Columbia: zoning officer, planning officer, manager of code compliance, health officer, emergency management coordinator, and the historic district liaison to the Historic Architectural Review Board. Doolittle asked Helm to come look at the property due to the discovery of several large cracks in the outside walls.

Helm arrived at the property on a Saturday morning. After walking through the building, Helm was concerned with the instability he observed. Doolittle asked Helm about the likelihood of an emergency demolition of the

property. Helm responded, "I don't have the authority to do that. You need to get a structural engineer … here to make a professional determination."

Doolittle contacted a structural engineer, Christian H. McKee, Jr. McKee inspected the property that same morning and immediately informed Doolittle that the building was collapsing. He further opined that the building could be saved, but not without risks to the contractors and neighbors. Doolittle informed McKee that he did not want to risk anyone's life and preferred demolishing the structure. To that end, he requested that McKee immediately prepare a written report documenting his findings and conclusions.

McKee prepared and sent his report to Doolittle that same day. In his report, McKee opined that he "found several indications of instability that will endanger the health, safety, property, and public welfare." He indicated that the chimney, on the north wall of the second floor, had "dropped 2½ [inches] from this morning and is still moving." He noted a significant sloping of the first floor towards the north exterior wall. In the basement, he observed a "considerable bow to the overhead floor system. The stone is currently separating from the wall." Additionally, the excavation in the basement had left the foundation wall "with virtually no support." As a result, the written report recommended "the demolition start as soon as possible due to the rapid[] deterioration of the north wall."

After receiving this report, Helm issued an emergency demolition permit for the property. The property was demolished shortly thereafter. DI demanded coverage under the policy, and Motorists denied the claim.

DI subsequently instituted this action against Beaver Creek and Motorists. On January 8, 2013, DI signed a joint tortfeasor release with Beaver Creek, releasing and discharging Beaver Creek's liability for all claims arising out of the destruction of the property. The release indicates that it discharged liability on behalf of DI and, among others, its insurers, in exchange for the sum of $250,000.

Ultimately, Motorists filed a motion for summary judgment. In this motion, it raised three issues. First, that no collapse had occurred under the policy. Second, that the loss was not covered due to the governmental action exclusion. Finally, that DI had waived its claims when it released Beaver Creek, as the release destroyed Motorists' subrogation rights.

On December 31, 2015, the trial court granted summary judgment to Motorists on the first and second grounds, and thus did not reach Motorists' third argument. On February 1, 2016, Doolittle electronically filed a notice of appeal and request for transcripts.[1] The Prothonotary rejected the filing due to the lack of specificity in the request for transcripts. However, the

_____

[1] The thirtieth day after December 31, 2015, was January 30, 2016. However, that date fell on a Saturday. Thus, the appeal period ran until
*(Footnote Continued Next Page)*

[f]ailure of an appellant to take any step other than the timely filing of a notice of appeal does not affect the validity of the appeal, but is subject to such action as the appellate court deems appropriate, which may include, but is not limited to, remand of the matter to the lower court so that the omitted procedural step may be taken.

Pa.R.A.P. 902. "A timely notice of appeal triggers the jurisdiction of the appellate court, notwithstanding whether the notice of appeal is otherwise defective." *Commonwealth v. Williams*, 106 A.3d 583, 587 (Pa. 2014). Thus, the defect in the request for transcript did not act to nullify our jurisdiction. Any errors in the notice of appeal or request for transcript have been corrected, and we may turn to the merits of this appeal.

On appeal, DI challenges the trial court's grant of summary judgment to Motorists. We review a decision granting summary judgment according to the following standard.

A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. As with all questions of law, our review is plenary.

In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a nonmoving party to adduce sufficient evidence on an issue

*(Footnote Continued)* ────────────────

Monday, February 1, 2016. *See* 1 Pa.C.S.A. § 1908 (providing for computation of time).

- 5 -

essential to his case and on which it bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law. Lastly, we will view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

*JP Morgan Chase Bank, N.A. v. Murray*, 63 A.3d 1258, 1261-62 (Pa. Super. 2013) (citation omitted).

In granting summary judgment, the trial court held that DI had not established that it was entitled to coverage under the policy and that coverage was explicitly excluded under the policy. "The interpretation of an insurance policy is a question of law for the court." *Continental Casualty Co. v. Pro Machine*, 916 A.2d 1111, 1118 (Pa. Super. 2007) (citation omitted). Our goal in interpreting the language of an insurance policy is to "ascertain the intent of the parties as manifested by the language of the written instrument." *Kane v. State Farm Fire and Casualty Co.*, 841 A.2d 1038, 1042 (Pa. Super. 2003). (citation omitted). "The polestar of our inquiry is the language of the insurance policy." *Continental Casualty Co.*, 916 A.2d at 1118 (citation omitted). This Court's function in analyzing an insurance policy is to construe words of common usage in their natural, plain, and ordinary sense. *See id*.

"In an action arising under an insurance policy, our courts have established a general rule that it is a necessary prerequisite … for the insured to show a claim within the coverage provided by the policy." *McEwing v. Lititz Mutual Insurance Co.*, 77 A.3d 639, 646 (Pa. Super.

- 6 -

2013) (citation and internal quotation marks omitted). In contrast, where denial of coverage under the policy is based upon the application of a policy exclusion, "the insurer has asserted an affirmative defense, and accordingly, bears the burden of proving such defense." *Id*. (citation omitted).

The trial court based its grant of summary judgment on two grounds. First, that DI had not established that its loss was a covered loss under the policy. DI bore the burden of proof on this issue. We therefore we review whether the trial court committed an error of law in determining whether DI had adduced sufficient evidence to create an issue of material fact.

The trial court rightfully focused its analysis on the policy language that provided coverage for losses "caused by collapse of a building or any part of a building." The trial court also correctly observes that Pennsylvania case law has long held that the term "collapse" is not ambiguous, and that it requires a "sudden falling together of a structure." ***401 Fourth Street, Inc. v. Investors Insurance Group***, 879 A.2d 166, 172 n.2 (Pa. 2005). However, it is important to note that the Supreme Court has noted that the argument that the term "collapse" is ambiguous carries "some force," ***id***., at 172. Furthermore, at least one justice (now Chief Justice), explicitly endorsed the expansion of the term to include an imminent collapse where there has been no actual falling down of the structure, ***see id***., at 176 (Saylor, J., dissenting), while the Majority suggested, in *dicta*, that "collapse" can "reasonably be interpreted" to include both immediate

collapse and "settling, cracking or bulging" that "result[s]" in collapse, *id*., at 174-175 n. 3.

Here, as in ***401 Fourth Street Inc.***, there is no need to reconsider the precise meaning of "collapse," as we conclude that DI adduced sufficient evidence to support a finding that a collapse was in progress. In his opinion letter dated February 24, 2007, professional engineer Charles McKee provided his own personal observations of the property. He noted that "[t]he chimney, on the north wall, on second floor, *has dropped 2 ½ [inches] from this morning and is still moving*. The floor is pulled away from North exterior brick wall 2 [inches] and the ceiling from the same wall ½ [inch]." (emphasis supplied). Furthermore, he noted that the first story floor system sloped considerably towards the north wall. In the basement, there was a vertical crack in the foundation of the north wall, and "considerable bow" to the overhead first story floor system. From the exterior, he observed that the north wall was bowed and cracked.

In addition, DI submitted the November 2, 2012, expert report of professional engineer David Aufiero. Aufiero provided that, in his professional opinion, "[a]t the time the partial collapse was discovered it was not feasible or prudent to attempt to stabilize the building as an extremely unsafe and hazardous work environment existed … and *the exterior masonry walls of the structure had already experienced significant settlement damages*." (emphasis supplied).

Viewed in a light most favorable to DI, these reports establish that the property's chimney was sinking at a rate of greater than 2½ inches per day. Furthermore, they establish that the north wall of the property was bowing outwards, creating a separation from interior floor systems and causing a significant slope down towards the north wall. Both engineers opined that the collapse could accelerate at any moment and thus it would endanger the lives of workers to attempt to fix the property. These findings would support a conclusion that the property was in the process of collapsing on February 24, 2007. At the very least, the finding that the chimney was falling at a rate of over 2½ inches per day is sufficient to support a conclusion that a part of the property had collapsed. We therefore conclude that the trial court erred when it concluded that DI had failed to adduce sufficient evidence to establish that its loss was covered under the policy.

In its alternative conclusion, the trial court held that the governmental action exclusion in the policy applied to exclude coverage of DI's loss. Under "Exclusions," the policy provides that Motorists "will not pay for loss or damage caused directly or indirectly by … [s]eizure or destruction of property by order of governmental authority." As a policy exclusion, Motorists bore the burden the establishing its application. **See McEwing**, **supra**. Thus, in order to justify a grant of summary judgment on this ground, Motorists was required to demonstrate the absence of any dispute of material fact regarding its application.

The trial court held that Motorists had established that the property was destroyed pursuant to the order of Helm. Helm testified that he was the "zoning and planning officer … manager of the code compliance department, … health officer for the Columbia board of health, emergency management coordinator for the borough, and the historic district liaison to the [Historic Architecture Review Board]." N.T., Deposition, 12/13/11, at 7. He was primarily involved with DI and the property in his role as liaison to the Historic Architecture Review Board. *See id*., at 13; 15.

On February 24, 2007, Doolittle contacted Helm and asked him to come to the property and "help him determine what exactly he should do." *Id*., at 16. After a tour of the property, Doolittle asked Helm about "the likelihood of doing an emergency demolition due to the instability." *Id*., at 21. Helm responded, "I don't have the authority to do that. You need to get a structural engineer … here to make a professional determination." *Id*.

When questioned by counsel for DI, Helm answered affirmatively to the question "you had the ultimate call as to whether or not the building *could be* demolished, is that correct?" *Id*., at 26 (emphasis supplied). However, later in the deposition, while being questioned by counsel for Motorists, the following exchange took place.

> Q.    … Did you mean you needed a structural engineer's opinion before you had authority to make a decision on demolition?
>
> A.    That's correct.

Q. And once the structural engineer, you had discussions with him, you had the decision to make to demolish the building?

A. That's correct.

Q. And in doing so, you did so in your official capacity as an official of Columbia Borough?

A. Yes, sir.

*Id*., at 39.

There is no other evidence regarding the scope of Helm's authority or under what authority he was acting when he approved the demolition of the property. The record does not contain any reference to the powers or authority granted to Helm by Columbia.

Based on this evidence, several different conclusions could be reached. First, it is possible that Helm ordered the demolition of the property under his authority as a health officer or as the emergency management coordinator. However, it is equally possible, under this evidence, to conclude that Helm approved Doolittle's request to demolish the building under his authority as Historic Architecture Review Board liaison. If a fact-finder were to come to the first conclusion, Motorists would be entitled to a defense verdict on this policy exclusion. In contrast, if a fact-finder were to reach the second conclusion, Motorists would not be entitled to a defense verdict pursuant to this policy exclusion. As the moving party seeking summary judgment on an issue upon which it bore the burden of proof, Motorists was required to adduce evidence capable of conclusively resolving this issue in its

favor. As either finding would be supported by the evidence in the certified record, Motorists has not met this burden, and the trial court erred in granting summary judgment on this ground.

Motorists argues that we can affirm the grant of summary judgment based upon the fact DI has destroyed Motorists subrogation rights against Beaver Creek. The trial court did not reach this issue, but Motorists did assert it as a ground for summary judgment in its motion. Thus, contrary to DI's arguments, this issue is preserved for our analysis. **See Commonwealth v. Burns**, 988 A.2d 684, 690 n.6 (Pa. Super. 2009).

In its brief argument in support of this issue, Motorists contends that pursuant to **Zourelias v. Erie Insurance Group**, 691 A.2d 963 (Pa. Super. 1997), DI's rights to sue it were extinguished when DI released Beaver Creek on behalf of itself and its insurers. Perhaps tellingly, Motorists does not cite to the provision of the policy that grants it subrogation rights. Our review has located a provision under the conditions section of the policy that provides "If any person or organization to or for whom we make payment under this coverage form has rights to recover damages from another, *those rights are transferred to us to the extent of our payment*." (emphasis supplied). As Motorists has concededly not made any payments to DI, those rights were never transferred to Motorists.

This distinguishes the present case from **Zourelias**. **See** 691 A.2d at 965 (reviewing and applying a clause that obligated the insured to do

"whatever was proper to secure the insurer's subrogation rights" and "do nothing to harm these rights"). Furthermore, *Zourelias* and the cases cited therein arose in the context of uninsured and underinsured motorists claims. *See id*. Thus, the statutory rights to subrogation found therein arise from the Financial Responsibility Law ("FRL"), which is a comprehensive statutory framework intended to address the issue of automobile insurance. *See Melendez v. Pennsylvania Assigned Claims Plan*, 557 A.2d 767, 768 (Pa. Super. 1989). While Motorists references a statutory right to subrogation in its short argument on appeal, it does not cite to or otherwise identify this authority. Clearly, the FRL does not apply in this case, and Motorists has not identified any other statutory basis for its argument. We therefore conclude that Motorists has failed to establish that it is entitled to summary judgment on this ground.

Any concerns that DI might receive a double recovery, or that Motorists would suffer a loss through the release with Beaver Creek can be addressed through a molded verdict, if necessary. As we can find no basis upon which Motorists was entitled to summary judgment, we reverse the order and remand for further proceedings.

Order reversed. Case remanded for proceedings consistent with this memorandum. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>11/16/2016</u>