J-A06043-20

2020 PA Super 84

| | | |
|---|---|---|
| GEMINI INSURANCE COMPANY | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MEYER JABARA HOTELS LLC, COLD | : | |
| WASH ZONE, LLC, PRACTICAL | : | |
| NETWORK SECURITY SOLUTIONS, | : | No. 2312 EDA 2019 |
| INC., THOMAS LUTHER, LISA | : | |
| STRATTON, AND MJ EMPLOYMENT | : | |
| SERVICES, INC. | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RISK PLACEMENT SERVICES, INC., | : | |
| ARTHUR J. GALLAGHER RISK | : | |
| MANAGEMENT SERVICES, INC., AND | : | |
| ARTHUR J. GALLAGHER & CO. | : | |
| | : | |
| | : | |
| APPEAL OF: MEYER JABARA HOTELS | : | |
| LLC | : | |

Appeal from the Order Entered June 26, 2019
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  February Term, 2017 No. 2782

BEFORE:   STABILE, J., KING, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:                **FILED APRIL 03, 2020**

Appellant, Meyer Jabara Hotels LLC ("Meyer Jabara"), appeals from the

trial court's June 26, 2019, order granting the motions for summary judgment

filed by Gemini Insurance Company ("Gemini"), as well as Risk Placement

---

[*] Former Justice specially assigned to the Superior Court.

Services, Inc., Arthur J. Gallagher Risk Management Services, Inc., and Arthur J. Gallagher & Co. (collectively "the Risk/Gallagher defendants") in this declaratory judgment action. After a careful review, we affirm.[1]

The relevant facts and procedural history are as follows: Meyer Jabara is a management company responsible for providing management services to the Sheraton University City Hotel ("the Sheraton Hotel"), which is owned by the University of Philadelphia ("the University"). Kenneth Kapikian was the general manager of the Sheraton Hotel, and Dennis Gagliardi was the chief engineer of the Sheraton Hotel.

The U.S. Attorney for the Eastern District of Pennsylvania filed criminal complaints against Mr. Kapikian and Mr. Gagliardi charging them with wire fraud, conspiracy to commit money laundering, and aiding and abetting. The U.S. Attorney averred that, in June of 2006, the duo created Cold Wash, which they used to submit invoices for payment to the Sheraton Hotel even though Cold Wash provided no services to the Sheraton Hotel. The U.S. Attorney specifically alleged that from May of 2008 to December of 2013 the duo submitted false invoices totaling $2,328,977.00 to the Sheraton Hotel for services that were never rendered by Cold Wash.

---

[1] On August 14, 2018, default judgment was entered against Cold Wash Zone, LLC ("Cold Wash"). Further, on September 4, 2018, the matter was marked as discontinued/settled with regard to all claims and cross-claims against Thomas Luther and his company, Practical Network Security Solutions, Inc. ("Practical Network").

Additionally, the U.S. Attorney averred Mr. Kapikian and Mr. Gagliardi instructed various vendors, including Thomas Luther and Lisa Stratton, to inflate service invoices, by as high as approximately 20%, so that the duo could collect the difference. The U.S. Attorney alleged this fraudulent scheme resulted in "kickbacks" to Mr. Kapikian and Mr. Gagliardi totaling approximately $710,406.00.

On June 11, 2015, Mr. Kapikian and Mr. Gagliardi entered guilty pleas to numerous counts of wire fraud and conspiracy to commit money laundering. Mr. Kapikian, who was sentenced to 60 months in jail, was ordered to pay restitution to the University, jointly and severally, in the amount of $3,039,383.00. Furthermore, Mr. Gagliardi, who was sentenced to 12 months in jail to be followed by a period of probation, was ordered to pay restitution to the University, jointly and severally, in the amount of $2,238,977.00. The federal government seized $359,116.89 from two bank accounts linked to Cold Wash.[2]

_____

[2] The U.S. Attorney also filed a criminal complaint against Thomas Luther, who owned Practical Network, averring he participated in the fraudulent scheme by charging for network monitoring services, which were never rendered to the Sheraton Hotel, so that Mr. Kapikian and Mr. Gagliardi could receive a "kickback." Mr. Luther pled guilty to wire fraud and aiding and abetting, and he was sentenced to four years of probation, as well as ordered to pay restitution in the amount of $143,291.00.

Additionally, the U.S. Attorney filed a criminal complaint against Lisa Stratton averring she participated in the fraudulent scheme by submitting falsely inflated invoices for decorating services, which were rendered to the Sheraton Hotel, so that Mr. Kapikian and Mr. Gagliardi could receive a

Meanwhile, as it relates to the instant civil matter, on March 3, 2014, the University sent Meyer Jabara a letter indicating there were "financial irregularities" at the Sheraton Hotel. Additionally, on September 18, 2014, the University sent Meyer Jabara a letter advising Meyer Jabara that the University was investigating the events, and Meyer Jabara should contact its insurer.

Accordingly, since Gemini had issued a professional liability insurance policy ("insurance policy") to Meyer Jabara for the period of July 1, 2014, to July 1, 2015,[3] Meyer Jabara provided Gemini with notice of the University's claim. On September 19, 2014, Vela Insurance Services ("Vela"), which is the administrator for Gemini, acknowledged receipt of the notice.

On December 15, 2015, the University sent a letter to Meyer Jabara demanding payment in the amount of $5,438,784.00 for losses and damages arising from the criminal scheme perpetrated by several entities and individuals working at the Sheraton Hotel, including Mr. Kapikian, Mr. Gagliardi, Cold Wash, Practical Network, Mr. Luther, and Ms. Stratton. On

_____

"kickback." She pled guilty to wire fraud and aiding and abetting, and she was sentenced to five years of probation, as well as ordered to pay restitution in the amount of $499,915.31.

[3] The insurance policy was issued for the period of July 1, 2014, to July 1, 2015, with limits of liability of $1 million for each claim and in the general aggregate, subject to a $35,000.00 deductible per claim.

December 17, 2015, Meyer Jabara forwarded the demand letter to Vela and requested coverage for the claim under the insurance policy.

On January 7, 2016, Vela sent a letter to Meyer Jabara agreeing that Gemini would defend Meyer Jabara with regard to the University's claim subject to a complete reservation of its rights to disclaim coverage, as well as seek subrogation from other parties. On March 10, 2016, counsel for Meyer Jabara requested Gemini approve a pending settlement between the University and Meyer Jabara, and counsel specifically requested Gemini pay the full $1 million liability limit under the insurance policy as contribution toward any settlement between Meyer Jabara and the University.

On March 15, 2016, Gemini and Meyer Jabara entered into an agreement whereby Gemini would advance an indemnity payment of $975,000.00 under the insurance policy as contribution to Meyer Jabara's settlement with the University. However, the agreement provided Gemini had the right to first initiate a coverage action to determine its coverage obligations under the insurance policy, and, if Gemini prevailed on such action, Meyer Jabara would reimburse the full advanced indemnity payment to Gemini.

In July of 2016, the University and Meyer Jabara entered into a settlement agreement. A portion of the settlement included the $975,000.00 advanced indemnity payment, which was paid from the proceeds of the

insurance policy issued by Gemini to Meyer Jabara as discussed in the parties' March 15, 2016, agreement.

On November 6, 2017, Gemini filed a civil complaint[4] seeking a declaration with respect to Meyer Jabara's demand for coverage and indemnity. Specifically, in Count I of the complaint, Gemini presented a claim against Meyer Jabara seeking a declaration as to whether Gemini, under the insurance policy, had a duty to defend and/or indemnify Meyer Jabara for the University's claim. If no duty existed, Gemini requested reimbursement of the advanced indemnity payment ($975,000.00) made to Meyer Jabara. If a duty existed, Gemini claimed Meyer Jabara paid only $10,000.00 towards the $35,000.00 per claim insurance deductible and, thus, Meyer Jabara should be compelled to pay the remainder of the deductible.

Moreover, in the complaint, Gemini averred that "[i]n the alternative, should [the court] determine there is coverage under the [insurance] policy for the [University's claim], Gemini seeks to recoup its damages and/or losses by way of subrogation claims against Cold Wash, Practical Network, [Mr.] Luther, [Ms.] Stratton, and MJ Employment."[5] Gemini's Complaint, filed 11/6/17, at 3 ¶5.

---

[4] This was Gemini's second amended complaint.

[5] MJ Employment refers to MJ Employment Services, Inc., which is a subsidiary of Meyer Jabara.

In this vein, in Count II of the complaint, under the theory of subrogation, Gemini presented a claim of negligence against Cold Wash, Practical Network, Mr. Luther, Ms. Stratton, and MJ Employment ("collectively the defendants"). Specifically, Gemini asserted the defendants were negligent and breached a duty of care owed to Meyer Jabara. Gemini asserted the defendants were directly liable for their own negligence, as well as vicariously liable for the acts of their agents and servants.

In Count III of the complaint, under the theory of subrogation, Gemini presented a breach of contract claim against MJ Employment. Specifically, Gemini asserted MJ Employment entered into a subcontract with Meyer Jabara to provide agents, including Mr. Kapikian and Mr. Gagliardi, to work at the Sheraton Hotel, and the subcontract was in effect when the illicit criminal activities occurred between May of 2008 and December of 2013. Gemini averred MJ Employment breached its contract with Meyer Jabara by failing to properly supervise the duo, failing to defend and indemnify Meyer Jabara for its liability arising out of the acts of the duo, and failing to procure adequate insurance to cover Meyer Jabara for liability from the acts of the duo.

In Count IV of the complaint, under the theory of subrogation, Gemini presented a claim of fraud against Cold Wash, Practical Network, Mr. Luther, and Ms. Stratton. Specifically, Gemini averred these defendants fraudulently and intentionally submitted false invoices to Meyer Jabara, and Meyer Jabara reasonably relied upon the false representations made by the defendants

when it billed the University. Gemini argued the defendants were directly liable for their own fraudulent conduct and vicariously liable for the fraudulent conduct of its agents.

On November 28, 2017, the parties filed a stipulation joining the Risk/Gallagher defendants, who provided brokerage services to Meyer Jabara, as additional defendants. Pursuant to Pennsylvania Rules of Civil Procedure 2252 and 2253, Meyer Jabara filed a joinder complaint against the Risk/Gallagher defendants averring that they had a duty, which they breached, to advise Meyer Jabara as to the appropriate coverage required to meet Meyer Jabara's complete insurance needs. Meyer Jabara sought a ruling that, to the extent Gemini has no duty to provide coverage under the insurance policy and Meyer Jabara must reimburse Gemini for the advanced indemnity payment of $975,000.00, the Risk/Gallagher defendants should be found liable for the loss.

The Risk/Gallagher defendants filed an answer with new matter and a cross-claim. Specifically, the Risk/Gallagher defendants denied liability as to Meyer Jabara's claim. Further, the Risk/Gallagher defendants presented a cross-claim against Cold Wash, Practical Network, Mr. Luther, and Ms. Stratton. In the cross-claim, the Risk/Gallagher defendants averred that, to the extent the court finds against the Risk/Gallagher defendants on Meyer Jabara's joinder claim, the liability should shift to Cold Wash, Practical

Network, Mr. Luther, and Ms. Stratton, who were primarily responsible for any loss by committing the criminal acts.

Thereafter, on December 8, 2017, Meyer Jabara and MJ Employment filed an answer with new matter to Gemini's complaint.

On June 29, 2018, Ms. Stratton filed an answer with new matter to Gemini's complaint, as well as a cross-claim against Meyer Jabara. In her answer, Ms. Stratton averred she is not liable to Gemini under any theory of recovery, including a theory of subrogation. In her cross-claim against Meyer Jabara, she averred that, to the extent Gemini has a duty to indemnify Meyer Jabara, and Gemini prevails on the subrogation based negligence claim against Ms. Stratton, she is entitled to contribution from Meyer Jabara.

On November 14, 2018, Gemini filed a motion for summary judgment. Therein, Gemini averred that various provisions of the insurance policy preclude coverage for Meyer Jabara with regard to the University's demands for restitution. Accordingly, Gemini averred it was entitled to summary judgment as a matter of law.

On November 19, 2018, the Risk/Gallagher defendants filed a motion for summary judgment against Meyer Jabara with regard to the joinder complaint. Therein, the Risk/Gallagher defendants averred there was no evidence that it deviated from any duty owed to Meyer Jabara such that the Risk/Gallagher defendants were entitled to judgment as a matter of law.

On November 19, 2018, Meyer Jabara filed a motion for summary judgment. Specifically, Meyer Jabara averred that, under the insurance policy, Gemini had a duty to indemnify Meyer Jabara with regard to the underlying University claim such that Meyer Jabara was entitled to judgment as a matter of law.

On November 19, 2018, MJ Employment filed a motion for summary judgment. Therein, MJ Employment averred that, as a wholly-owned subsidiary of Meyer Jabara, it was an insured under the insurance policy and, therefore, Gemini could not seek subrogation from MJ Employment. Furthermore, MJ Employment contended it did not breach any legal duty or contract with regard to Meyer Jabara.

By order entered on June 26, 2019, the trial court disposed of the four motions for summary judgment. Specifically, the trial court entered the following order:

1. Gemini's Motion for Summary Judgment is GRANTED. The [University] claim is excluded from coverage under the Policy, and Meyer Jabara Hotels, LLC, must repay the $975,000, less Gemini's recovery from third-party subrogees.[6]
2. [M.J.] Employment Services, Inc.'s Motion for Summary Judgment is GRANTED, and it is dismissed from the case.
3. The [Risk/Gallagher] Defendants' Motion for Summary Judgment is GRANTED and they are dismissed from the case.

---

[6] In its appellant's brief, Meyer Jabara indicates Gemini received money from Mr. Luther and Practical Network in exchange for discontinuing/settling the civil action against them.

> 4. Meyer Jabara Hotel, LLC's Motion for Summary Judgment is
>    DENIED.

Trial Court Order, filed 6/26/19 (footnote added).

On July 24, 2019, Meyer Jabara filed a notice of appeal from the trial court's June 26, 2019, order.[7] The trial court did not direct Meyer Jabara to file a Pa.R.A.P. 1925(b) statement, and accordingly, no such statement was filed. However, on August 28, 2019, the trial court filed an opinion pursuant to Pa.R.A.P. 1925(a).

---

[7] We note that Meyer Jabara's appeal appears to be interlocutory as the trial court's order did not dispose of all parties and all claims. However, an appeal may be taken as of right from an order that is made final or appealable by statute or general rule, even though the order does not dispose of all claims and of all parties. Pa.R.A.P. 311(a)(8). The Declaratory Judgments Act, 42 Pa.C.S.A. § 7532, provides that a declaration of rights, status, and other legal relations, whether affirmative or negative, "have the full force and effect of a final judgment[.]"

Here, the order at issue affirmatively/negatively declared the rights of the parties in the nature of a declaratory judgment. Thus, we conclude we have jurisdiction. *See Pennsylvania Manufacturers' Association Ins. Co. v. Johnson Matthey, Inc.*, 647 Pa. 85, 188 A.3d 396 (2018) (*per curiam*) (holding order declaring the rights of parties is final depending on the effect of the decision on the scope of the litigation and the practical effect of the decision on the outcome of the case); *Nationwide Mutual Ins. Co. v. Wickett*, 563 Pa. 595, 763 A.2d 813 (2000) (holding order granting declaratory relief and dismissing some but not all defendants is an appealable order); *Nationwide Mutual Ins. Co. v. Arnold*, 214 A.3d 688 (Pa.Super. 2019) (apply *Johnson Matthey, Inc.* and holding summary judgment order declaring insurer's duty to defend and/or indemnify the insured was appealable despite the fact the order did not dispose of all parties and all claims); Pa.R.A.P. 341, Note ("A party aggrieved by an interlocutory order granting or denying a declaratory judgment…may elect to proceed under Pa.R.A.P. 311(a)(8) or wait until the end of the case and proceed under subparagraph [Pa.R.A.P. 341](b)(1) of this rule.").

- 11 -

On appeal, Meyer Jabara presents the following issues in its "Statement of the Questions Involved":

1. Whether the trial court erred as a matter of law in ruling that Kenneth Kapikian and Dennis Gagliardi were "employees" of [Meyer Jabara] and thus "Insureds" within the meaning of the [Gemini insurance policy] at issue thereby triggering two exclusionary provisions, where: (i) the natural, plain, and ordinary meaning of "employee" refers to a person who is paid by, supplied workplace benefits by, and receives a federal W-2 from a particular entity, none of which were performed by [Meyer Jabara] with regard to [Mr.] Kapikian and [Mr.] Gagliardi; (ii) even if "employee" was susceptible to more than one reasonable meaning, the interpretation supporting coverage in favor of [Meyer Jabara] must be applied as a matter of law; and (iii) after considering the parties' competing meanings of "employee" and concluding "[b]oth of these arguments carry weight"—demonstrating both meanings were reasonable—the trial court nonetheless chose [Gemini's] interpretation excluding coverage rather than [Meyer Jabara's] interpretation in favor of coverage?

2. Whether the trial court erred as a matter of law by concluding that employees who engage in criminal acts of theft solely for their own benefit are nevertheless rendering professional services on behalf of their employer for purposes of determining whether those employees meet the definition of "Insured" in the [Gemini insurance policy] thereby triggering two exclusionary provisions, especially where the trial court concluded their acts were not in service of the employer?

3. Whether an insurance company as a matter of law must be deemed to have waived the right to deny insurance coverage to its insured when it claims entitlement by subrogation to the rights of its insured against third parties, initiates a subrogation action against third parties based on subrogation to the right of its insured, and recovers a monetary settlement based on the insured's rights?

4. Whether the trial court erred in considering the issue of insurance broker liability by equating "special relationship" with "fiduciary duty," thus failing to recognize the record contains sufficient facts to demonstrate [the Risk/Gallagher defendants] engaged in a "special relationship" with [Meyer Jabara] in rendering insurance brokerage and placement services so as to

preclude summary judgment in favor of [the Risk/Gallagher defendants]?

Meyer Jabara's Brief 4-7 (suggested answers omitted).

Initially, we note the entry of summary judgment is governed by Rule 1035.2 of the Rules of Civil Procedure:

> After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law
>
> (1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or
>
> (2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.C.P. 1035.2.

> Our standard of review of an appeal from an order granting summary judgment is well settled: Summary judgment may be granted only in the clearest of cases where the record shows that there are no genuine issues of material fact and also demonstrates that the moving party is entitled to judgment as a matter of law. Whether there is a genuine issue of material fact is a question of law, and therefore our standard of review is *de novo* and our scope of review is plenary. When reviewing a grant of summary judgment, we must examine the record in a light most favorable to the non-moving party.

***Newell v. Montana West, Inc.***, 154 A.3d 819, 821–22 (Pa.Super. 2017) (citations and internal quotation marks omitted).

Meyer Jabara's first and second claims are interrelated and concern the issue of whether the trial court properly concluded Gemini had no duty to

defend and/or indemnify Meyer Jabara such that Gemini was entitled to summary judgment as a matter of law. Specifically, Meyer Jabara's first and second claims address whether the trial court properly held Gemini was entitled to deny coverage under two exclusions contained in the insurance policy.

In this vein, in its first issue, Meyer Jabara avers that, as a matter of law, Mr. Kapikian and Mr. Gagliardi were not employees of Meyer Jabara; but rather, they were employees of MJ Employment. In its second issue, Meyer Jabara avers that, as a matter of law, Mr. Kapikian and Mr. Gagliardi were not "rendering professional services on behalf of the Named Insured" (Meyer Jabara) when they committed their crimes for which the University sought restitution from Meyer Jabara. Therefore, Meyer Jabara contends the duo did not qualify as "Insureds" within the meaning of the insurance policy so as to trigger either the criminal acts or personal profit exclusions.

The interpretation of an insurance policy is a question of law that we will review *de novo*. **See 401 Fourth Street, Inc. v. Investors Ins. Group**, 583 Pa. 445, 879 A.2d 166, 170 (2005). Our primary goal in interpreting a policy, as with interpreting any contract, is to ascertain the parties' intentions as manifested by the policy's terms. **401 Fourth Street, Inc.**, 879 A.2d at 170. "When the language of the policy is clear and unambiguous, [we must] give effect to that language." **Id.** Alternatively, when a provision in the policy is ambiguous, "the policy is to be construed in favor of the insured to further

- 14 -

the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage." *Id.*

"A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385, 390 (1986) (citations omitted). However, the lack of a definition for an operative term in an insurance policy does not necessarily render the policy ambiguous. *See Burton v. Republic Ins. Co.*, 845 A.2d 889 (Pa.Super. 2004).

> [W]e must accord the contract provisions their accepted meanings, and we cannot distort the plain meaning of the language to find an ambiguity. Moreover, we will not find a particular provision ambiguous simply because the parties disagree on the proper construction; if possible, we will read the provision to avoid an ambiguity.

*Id.* at 893 (citations omitted). *See Madison Const. Co. v. The Harleysville Mut. Ins. Co.*, 557 Pa. 595, 735 A.2d 100, 106 (Pa. 1999) ("[C]ontractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. We will not, however, distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity.") (quotation marks and quotation omitted)).

Here, it is undisputed that the insurance policy provided the following:

IV. EXCLUSIONS
The Policy does not apply to any Claim or Claim Expense Arising Out of any actual or alleged:

> A. Criminal, fraudulent, dishonest, malicious, or knowingly wrongful act or omission committed by or with the knowledge of any insured.

- 15 -

> Notwithstanding the foregoing, the Company will provide a defense for any Suit asserting any such Claim, which is otherwise covered by this Policy, until there is an admission, judgment, or adjudication, by or against any Insured, that such conduct occurred. The Company also agrees that such insurance as would otherwise be afforded under this Policy shall be applicable to any Insured who is a natural person, other than the Named Insured, who did not participate or acquiesce in, or remain passive after having knowledge of such conduct.
>
> B. The gaining by any Insured of any personal profit, gain or advantage to which any Insured was not legally entitled.

Insurance Policy, Effective 7/1/14, Exclusions A and B.

Moreover, the insurance policy defined "Insured" as "[t]he Named Insured listed on the Declarations Page[8] including any partner, director, officer or full time, part time, temporary and leased employee of the Named Insured while rendering Professional Services on behalf of the Named Insured." *Id.* at Professional Liability Definitions (footnote added).

Here, relevant to Meyer Jabara's first issue, there is no dispute the term "employee" is not specifically defined in the insurance policy. Meyer Jabara argues that, as a matter of law, the trial court should have accepted its definition of what constitutes an "employee" for purposes of the insurance

---

[8] There is no dispute that Meyer Jabara is the Named Insured on the Declarations Page.

policy; namely, that a person is an "employee" of the Named Insured only when he or she is paid by, supplied workplace benefits by, and receives a federal W-2 form from the Named Insured.[9] Alternatively, Meyer Jabara argues the term "employee" is ambiguous and, thus, should be construed against Gemini.

In the case *sub judice*, the trial court concluded the term "employee" is not ambiguous. Further, in defining the term, the trial court relied on the common and approved meaning contained in Black's Law Dictionary. **See** Trial Court Opinion, filed 8/26/19, at 6. Thus, the trial court concluded an "employee" is "[a person] who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance." **Id.** (quoting *Black's Law Dictionary* 564 (10th ed. 2014)).

As the trial court noted, this definition is consistent with Pennsylvania's case law indicating that "control over the work to be completed and means of performance" is often used in determining whether an employer/employee relationship exists. **See** Trial Court Opinion, filed 8/26/19, at 6. The trial court specifically concluded that, based on the common and approved meaning, the term "employee" as used in the insurance policy was not

---

[9] Meyer Jabara contends MJ Employment, as opposed to Meyer Jabara, performed these functions with relation to Mr. Kapikian and Mr. Gagliardi such that the duo were solely "employees" of MJ Employment.

- 17 -

restricted solely to those people who received a salary, workplace benefits, or a federal W-2 form from the Named Insured (Meyer Jabara). Trial Court Opinion, filed 8/26/19, at 6-7.

We conclude the trial court did not err in concluding the term "employee" was not ambiguous and in giving the term "employee" the common and approved meaning of the word as it is described in Black's Law Dictionary. Simply put, the fact Meyer Jabara and Gemini did not agree on the definition of the term did not render the insurance policy ambiguous, and it is well-settled that courts may look to the dictionary in order to determine the meaning of words in an insurance policy.[10] *See Bruno v. Erie Ins. Co*, 630 Pa. 79, 106 A.3d 48, 75 (2014) ("[T]he common and approved meaning of a word may be ascertained from an examination of its dictionary definition.") (citations omitted)); *Metzger v. Clifford Realty Corp*., 476 A.2d 1, 5 (Pa.Super. 1984) (stating that a contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends, nor is a contract rendered ambiguous by the mere fact that parties do not

---

[10] Further, as the trial court held "[i]t is possible that a person may have two simultaneous employers.  A single individual may stand in the relation of an employee to two or more employers at the same time."  Trial Court Opinion, filed 8/26/19, at 7 (quotation marks and footnote omitted).  Accordingly, as the trial court noted, in the case *sub judice*, there is no genuine issue of material fact that Mr. Kapikian and Mr. Gagliardi are employees of both Meyer Jabara and its subsidiary, MJ Employment. *See id.*

agree upon the proper construction). Furthermore, the trial court concluded there was no genuine issue of material fact that Meyer Jabara "controlled the employees' work, hiring, discharge, and promotion." Trial Court Opinion, filed 8/26/19, at 7. Accordingly, we find no error in the trial court's conclusion that Mr. Kapikian and Mr. Gagliardi were "employees" of Meyer Jabara as the term was used in the insurance policy.

Next, as it is relevant to Meyer Jabara's second issue, the insurance policy relevantly defines the phrase "Professional Services" as follows:

"'Professional Services'" means only those professional services listed on the Declarations Page as performed by or on behalf of the Named Insured for others for fee or other form of compensation." Insurance Policy, Effective 7/1/14. According to the Declarations Page, "Professional Services" includes:

> Hotel Professional Management Services meaning those services you perform for others pursuant to a signed and valid management contract, including financial management and accounting services, human resources management services, food and beverage management services, marketing services, operation management services, communications, information and technology management services.

*Id.*, Endorsement 14.

Meyer Jabara contends there is no genuine issue of material fact, and as a matter of law, Mr. Kapikian and Mr. Gagliardi were not "rendering Professional Services on behalf of the Named Insured" when they "stole from the Hotel." Meyer Jabara's Brief at 47. Meyer Jabara argues the plain language of the insurance policy does not cover Mr. Kapikian's and Mr.

- 19 -

Gagliardi's criminal acts since "(1) stealing money is not a 'Professional Service,' and (2) the criminal conduct was not done 'on behalf of' Meyer Jabara as it was not in furtherance of Meyer Jabara's business [of providing hotel management services] and did not benefit (and, in fact actually harmed) Meyer Jabara." Meyer Jabara's Brief at 48.

In rejecting Meyer Jabara's argument, the trial court concluded the following:

> [Meyer Jabara] argues that Kapikian's and Gagliardi's criminal activities do not meet the definition of rendering professional services on behalf of [Meyer Jabara]. However, [the trial court] finds that they do, and to rule otherwise would render the Criminal Acts Exclusion meaningless. The theft and fraud committed by the employees may not have been in service to [Meyer Jabara], but they used their authority and their time on duty at [the hotel] to have the opportunity to commit their crimes. When they, for example, paid invoices on behalf of the hotel, they were rendering professional services on behalf of [Meyer Jabara]; so too were they when they fraudulently inflated those invoices and took kickbacks. As noted by Gemini, this provision does not require the criminal actions to be taken in the Named Insured's *interest*. Such a requirement would mean that a Criminal Acts Exclusion such as this one would be superfluous, as most any criminal activities committed by an insured would be deemed to not be done while rendering professional services for the named insured.

Trial Court Opinion, filed 8/26/19, at 8 (footnote omitted) (italics in original).

We agree with the trial court's sound reasoning. There is no genuine issue of material fact that Mr. Kapikian and Mr. Gagliardi, who as indicated *supra* were employees of Meyer Jabara, committed their wrongful conduct out of which the underlying claim arose while they were performing their management responsibilities, such as hiring vendors and approving payments,

at the Sheraton Hotel. Meyer Jabara's argument that criminal conduct, which was committed by the employees during the performance of the employees' management responsibilities, can never be deemed a "professional service," forgoes the need for the criminal acts exclusion since, as the trial court concluded, all criminal conduct could be deemed out of the realm of "professional services." This is an unreasonable interpretation and, when the insurance policy is taken as a whole, the trial court properly concluded this was not the parties' intent. *See Maisano v. Avery*, 204 A.3d 515, 520 (Pa.Super. 2019) ("The whole instrument must be taken together in arriving at contractual intent. Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed.") (citation omitted)).

Accordingly, we conclude the trial court properly found there is no genuine issue of material fact and, as a matter of law, Mr. Kapikian and Mr. Gagliardi were "Insureds" under the insurance policy so as to trigger the application of the criminal acts and personal profit exclusions. *See Newell*, *supra*.

In its third issue, Meyer Jabara contends Gemini, as a matter of law, waived its right to deny coverage under the insurance policy when it recovered a monetary settlement during the pendency of the lawsuit against two of the third-party tortfeasors (Mr. Luther and Practical Network). Meyer Jabara argues Gemini's act of subrogating and recovering money from the third-party

tortfeasors demonstrates a voluntary relinquishment of its right to deny coverage to Meyer Jabara with regard to the University's claim.

In this vein, Meyer Jabara argues:

> If Gemini wanted to continue contesting coverage, then it could not consummate a subrogation recovery against the two third-party tortfeasors. When Gemini entered into a settlement with potentially responsible third parties relying on Meyer Jabara's rights, it knowingly and voluntarily crossed the legal rubicon between insurer disputing coverage and subrogating insurer admitting it owed coverage to its insured. Having crossed that line, Gemini cannot go back and continue disputing coverage. Instead, Gemini's voluntary actions constitute an admission of coverage for the [University's] claim and a clear choice to give up any right to challenge coverage for the claim. Therefore, Gemini waived and is now prevented from contending that the [insurance] policy does not cover the [University's] claim.

Meyer Jabara's Brief at 64 (emphasis omitted).[11]

This Court has relevantly stated the following:

> In order to establish a waiver, the evidence must show that acts of the insurance company constituted a voluntary, intentional relinquishment of a known right and the insurer had full knowledge of all pertinent facts…The rule is well established that conditions going to the coverage or scope of a policy of insurance…may not be waived by implication from the conduct or action of the insurer. The doctrine of implied waiver is not available to bring within the coverage of an insurance policy, risks that are expressly excluded therefrom. In Pennsylvania, the doctrine of waiver or estoppel cannot create [coverage] where none existed.

---

[11] Meyer Jabara cites no authority directly on point; but rather, Meyer Jabara asks this Court to apply the general rules of waiver and subrogation to find that Gemini is estopped from denying coverage because it settled with third-party tortfeasors during the pendency of the declaratory action.

***Wasilko v. Home Mut. Cas. Co.***, 232 A.2d 60, 63 (Pa.Super. 1967) (citation omitted) (citation and footnote omitted).

In the case *sub judice*, there is no dispute that, in the March 15, 2016, agreement between Gemini and Meyer Jabara, Gemini advanced a $975,000.00 indemnity payment to Meyer Jabara with the express stipulation that it continued "to fully reserve all rights, claims, defenses and obligations for coverage of the [University's] claim under the [insurance policy] with respect to all issues of defense and/or indemnity[.]" Parties' Agreement, dated 3/15/16, at 4. Furthermore, in its complaint, Gemini continued to specifically deny that coverage existed under the insurance policy, and Gemini set forth a subrogation claim against other third-party tortfeasors in an effort to recoup any portion of the advanced payment not reimbursed to Gemini by Meyer Jabara. There is no indication the settlement agreement between Gemini and the third-party tortfeasors (Mr. Luther/Practical Network) limited or waived Gemini's rights to continue disputing coverage with Meyer Jabara.

As for Meyer Jabara's claim that Gemini's settlement agreement with third-party tortfeasors implicitly waived Gemini's right to dispute coverage of the claim under the insurance policy, we disagree. As indicated *supra*, this Court has held that conditions going to coverage may not generally be waived by implication from the conduct of the insurer. ***See Wasilko***, ***supra***. Simply put, Gemini's steps to seek subrogation from third-party tortfeasors does not create coverage in an insurance contract where none existed. ***See id.*** Rather,

as the trial court held in applying the principles of subrogation, case law "prevents double recovery for the insurer." Trial Court Opinion, filed 8/26/19, at 5 (citing **Shockley v. Harleysville Mut. Ins. Co.**, 553 A.2d 973, 975 (Pa.Super. 1988)).

Thus, as a matter of law, while Gemini had no duty to indemnify Meyer Jabara pursuant to the exclusions in the insurance policy, and Meyer Jabara must repay the advanced indemnity payment, the trial court properly held the repayment should be "less the amount Gemini has recovered from third-party [tortfeasors]" so as to prevent a "double recovery" to Gemini.[12] Trial Court Opinion, filed 8/26/19, at 5.

In its final claim, Meyer Jabara contends that, to the extent there is no coverage for the instant matter under the insurance policy with Gemini, the trial court erred in ruling, as a matter of law, that the Risk/Gallagher defendants did not have a duty to properly advise Meyer Jabara as to its insurance coverage needs. Specifically, Meyer Jabara contends the trial court applied an incorrect legal standard when it concluded the Risk/Gallagher defendants owed "no heightened duty of care to Meyer Jabara because it owed no fiduciary duty." Meyer Jabara's Brief at 65 (citation to record omitted).

---

[12] As it relates to Meyer Jabara's claim of prejudice, we note there is no indication that Meyer Jabara filed its own action or cross-claim to seek damages from the third-party tortfeasors with whom Gemini settled during the pendency of its declaratory action.

In this vein, Meyer Jabara avers the trial court failed to apply Florida law to the within matter and, additionally, failed to understand that Florida law (unlike Pennsylvania law) provides that brokers, who have a "special relationship" with a client, may be subject to extra-contractually enhanced duties of care requiring the broker to advise the client about the coverage prudently needed to meet the client's complete insurance needs. Meyer Jabara argues that, in Florida (but not in Pennsylvania), a "special relationship" is a heightened and separate duty of care. Meyer Jabara posits there is a genuine issue of material fact as to whether such a "special relationship" existed between Meyer Jabara and the Risk/Gallagher defendants, as well as whether the Risk/Gallagher defendants breached the "special relationship."

Initially, we examine whether a conflict exists between the laws of Pennsylvania and Florida, which state's law should apply in the event of a conflict, and whether Meyer Jabara is otherwise entitled to relief on its claim.

Our Supreme Court has relevantly stated the following:

> Courts conduct a choice-of-law analysis under the choice-of-law rules of the forum state. Pennsylvania courts first consider whether a "true conflict" exists between the two states. This is because in some instances the purported conflict is ultimately revealed to be a "false conflict" – meaning that the laws of both states would produce the same result, or that one of the states has no meaningful policy-based interest in the issue raised.

***Melmark, Inc. v. Schutt by & Through Schutt***, ___ Pa. ___, 206 A.3d 1096, 1104 (2019) (citations omitted).

In the case *sub judice*, in arguing Florida law conflicts with Pennsylvania law as to the duties imposed upon brokers, Meyer Jabara relies upon *Tiara Condominium Ass'n, Inc. v. Marsh, USA, Inc.*, 991 F. Supp. 2d 1271 (S.D. Fla. 2014). Therein, the U.S. District Court recognized that Florida law holds that an insurance broker owes a duty of care to the insured to explain the coverage it has secured at the client's direction. *Id.* Additionally, Florida law imposes a duty of care upon a broker whereby the broker must use reasonable care in the procurement of requested insurance. *Id.*

As to whether a broker must advise the insured on the appropriate level of coverage needed to meet the client's needs, the U.S. District Court concluded the general law in Florida is that brokers do not have a duty to advise clients about their insurance needs. *Id.* However, the U.S. District Court held there is an exception to Florida's general rule. Specifically, "[t]he exception becomes operative when an insurance broker encourages and engages in a 'special relationship' with its client, thereby triggering an enhanced duty of care to advise the client about the amount of coverage prudently needed to meet its complete insurance needs." *Id.* at 1281 (citations omitted).

The U.S. District Court found such a "special relationship" includes:

> (1) where the agent misrepresented the nature of the coverage being offered or provided, and the insured justifiably relied on that representation in selecting the policy; (2) where the agent voluntarily assumed the responsibility for selecting the appropriate insurance policy for the insured (by express agreement or promise to the

insured); (3) where the agent held itself out as having expertise in a given field of insurance being sought by insured, and the insured relied on that expertise; (4) where the agent or broker exercised broad discretion to service the insured's needs, and received compensation above the customary premium paid for the expert advice provided; and (5) where the agent was intimately involved in the insured's business affairs, or regularly gave the insured advice or assistance in maintaining proper coverage.

*Id.* at 1281 (citations omitted).

Turning to Pennsylvania law, we conclude that, similar to Florida, the general law is that brokers do not have a duty to advise clients about their insurance needs. *See Wisniski v. Brown & Brown Ins. Co. of PA*, 906 A.2d 571 (Pa.Super. 2006). However, Pennsylvania, recognizes a broker may have heightened duties similar to those set forth in *Tiara Condominium Ass'n, Inc.*, *supra*. Thus, in Pennsylvania, where the broker has a "confidential relationship" with the client, the broker has enhanced duties of care to the client. *See Yenchi v. Ameriprise Financial, Inc.*, 639 Pa. 618, 161 A.3d 811 (2017) (holding broker has enhanced fiduciary duties where a "confidential relationship" exists between the broker and client); *Wisniski*, *supra* (same).

In determining whether there is a "confidential relationship" between the broker and client, "[t]he critical question is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by overmastering influence on one side or weakness, dependence, or trust,

justifiably reposed on the other side." **Id.** at 577 (quotation marks, quotation, and citation omitted).

Accordingly, in the case *sub judice*, as it relates to Meyer Jabara's claim that there is a conflict between the laws of Pennsylvania and Florida regarding a broker's duty to advise a client as to the insurance coverage needed to meet the client's complete insurance needs, we conclude that any purported conflict between Pennsylvania law and Florida law is a "false conflict" as the laws of both states would produce the same result. **See Melmark, Inc.**, **supra**.

Initially, it is undisputed that Meyer Jabara and the Risk/Gallagher defendants memorialized their relationship in a compensation agreement, which relevantly provided the following:

> [The Risk/Gallagher defendants] will not be operating in a fiduciary capacity, but only as Client's broker, obtaining a variety of coverage terms and conditions to protect the risk of Client's enterprise. [The Risk/Gallagher defendants] will seek to bind those coverages based upon Client's authorization, however, [the Risk/Gallagher defendants] can make no warranties in respect to policy limits or coverage considerations of the carrier. Actual coverage is determined by policy language, so read all policies carefully.

Compensation Agreement, dated 8/8/12.

Here, pursuant to Meyer Jabara's and the Risk/Gallagher defendants' express agreement, the trial concluded the Risk/Gallagher defendants had a contractual relationship setting forth the broker's duty, and there is no genuine issue of material fact that the Risk/Gallagher defendants did not

breach the compensation agreement. *See* Trial Court Opinion, filed 8/26/19, at 8-9.

As to whether the relationship between the Risk/Gallagher defendants and Meyer Jabara was such that there was an extra-contractually enhanced duty imposed upon the Risk/Gallagher defendants to advise Meyer Jabara as to its insurance coverage needs, we agree with the trial court that there was insufficient evidence creating a genuine issue of material fact.

In this regard, there is no dispute that Meyer Jabara is a sophisticated business entity, and William Meyer, who is responsible for the operations of Meyer Jabara, has a Juris Doctor, as well as a degree in Master of Business Administration. Trial Court Opinion, filed 8/26/19, at 9. Moreover, there is no dispute Meyer Jabara representatives retained control and authority to make all final decisions for Meyer Jabara, particularly as it related to insurance "carriers, the coverages, et cetera." William Meyer Deposition, dated 8/28/18, at 250, 273-74. Additionally, Meyer Jabara had a legal department, which made sure the insurance program conformed with the needed coverage and limits. *Id.* at 274.

Theresa Staganelli, who was the director of risk management and telecommunication services for Meyer Jabara, indicated neither she nor Mr. Meyer asked questions about the Criminal Acts Exclusion, which was contained in the insurance policy. Theresa Staganelli Deposition, dated 9/21/18, at 46-47. Furthermore, Ms. Staganelli indicated that, after representatives from the

Risk/Gallagher defendants provided Meyer Jabara with proposed insurance options, she and Mr. Meyer would discuss the options and then give the Risk/Gallagher defendants authorization to proceed. *Id.* at 53-54.

Moreover, Ms. Staganelli testified Meyer Jabara negotiated management agreements with other hotel owners and, in many situations, the hotel owners dictated the coverage limits and terms that Meyer Jabara later sought from the Risk/Gallagher defendants. *Id.* at 23-24. Specifically, as it related to the Sheraton Hotel, the insurance policy maintained by Meyer Jabara was "in compliance with the management contract for that property." *Id.* at 26. Ms. Staganelli was aware that, generally, additional limits of coverage could always be quoted by the Risk/Gallagher defendants for purchase by Meyer Jabara; however, overall cost of the insurance policy was an issue with which Meyer Jabara was concerned. *Id.* at 93-94.

Based on the aforementioned, we agree with the trial court that there is no evidence to support the finding there was an extra-contractually enhanced duty imposed upon the Risk/Gallagher defendants to advise Meyer Jabara as to its complete insurance coverage needs. **See Yenchi**, **supra**. Thus, as a matter of law, the trial court did not err in granting summary judgment in favor of the Risk/Gallagher defendants.

For all of the foregoing reasons, we affirm the trial court's June 26, 2019, summary judgment order.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/3/20